Cite as 2024 Ark. App. 475

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-24-329

| | |
|---|---|
| | **Opinion Delivered** October 9, 2024 |
| HEATHER KELLEY<br>APPELLANT | APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT [NO. 15JV-22-9] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

The Conway County Circuit Court terminated Heather Kelley's parental rights to her son, MC. On appeal, Kelley challenges the circuit court's findings on the statutory grounds for termination and potential harm. We affirm.

On 19 February 2022, the Arkansas Department of Human Services (DHS) received a hotline report that MC had been born the day before and tested positive for "benzos" and fentanyl. He was admitted to Arkansas Children's Hospital, where the staff became concerned about Kelley's mental health; she behaved erratically, was combative with staff, and could not complete sentences. The hospital had to remove her from the premises twice and would allow her to return only if she signed a behavioral contract. Nevertheless, there was another combative episode with Kelley on February 22, and due to concerns about her

mental health and ability to properly care for MC, DHS exercised a seventy-two-hour hold on him.

DHS petitioned for and was granted emergency custody of MC on February 28. The circuit court later found probable cause to continue custody with DHS, and on 2 May 2022, the court adjudicated MC dependent-neglected due to parental unfitness and mental instability. The court ordered Kelley to remain drug- and alcohol-free, submit to random drug screens, comply with the case plan and the orders of the court, cooperate with DHS and all service providers, complete parenting classes and a psychological evaluation, and attend counseling and follow the recommendations of her counselor.

The court reviewed the case in October 2022 and found that Kelley had partially complied with the case plan. Specifically, she had completed inpatient rehabilitation in August but did not attend a subsequent counseling referral. She later admitted that she had relapsed and used methamphetamine. The court ordered Kelley to remain drug-free and submit to frequent random drug testing; attend and complete all recommended drug-and-alcohol treatment, including support groups; and complete a mental health assessment and attend and complete all recommended counseling or mental health treatment.

In April 2023, the court entered a permanency-planning order finding that Luis Rodriguez-Celaya is MC's biological father and that the goal of the case would be reunification with a concurrent goal of termination of parental rights as to the mother and reunification or custody as to the father. The order noted that Kelley had made some progress on the case plan in recent months but had not made significant and measurable progress and had not diligently worked toward the goals of the case. Kelley had also recently

2

started counseling, had not been testing positive for illegal drugs, and had achieved some stability.

In June 2023, DHS petitioned to terminate Kelley's parental rights, citing failure to remedy conditions that caused removal, failure to provide significant material support or to maintain meaningful contact, and aggravated circumstances. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*), (ii)(*a*), (vii)(*a*), and (ix)*(a)(3)* (Supp. 2023).

The circuit court held a termination hearing on 27 July 2023. Dr. Ed Stafford testified that as part of a criminal proceeding in Van Buren County, he had performed a forensic evaluation of Kelley approximately one month before the termination hearing. He concluded that she had the capacity to understand the proceedings and assist her counsel in her own defense. He also found that she had no mental disease or defect.

Kenny Walley, Kelley's stepfather, testified that he and Kelley's mother had petitioned to have Kelley involuntarily committed earlier that year because "things were not going right . . . in her head." Kelley had been involuntarily committed for twenty-one days, but it was later determined the cause of her behavior was incorrectly prescribed medication.

Kelley testified that she currently lives in Clinton, Arkansas, and that Luis Rodriguez, MC's father, had moved in with her approximately six weeks ago. She is not employed but receives $1,037 monthly in disability. She also has a driver's license and a vehicle. She was starting outpatient counseling the next week and had seen another counselor, Jennifer House, during the pendency of the case. She was currently charged with communicating a false alarm in Van Buren County because she had made a false report to the police in 2022.

3

When asked if there were any services that DHS had not provided or any services that DHS could provide to help her, she answered, "Not that I know of. I didn't need much from DHS." She has weekly supervised visits with MC but had not been approved for a trial home placement.

On cross-examination, she confirmed that she had been using illegal substances at the beginning of the dependency-neglect case, but now that she was stabilized on prescription medication, she felt more in control. She had not used an illegal drug in six months and two days. She claimed that she had "never in [her] life used fentanyl." She also explained that the court had not ordered her to pay child support because she was on disability. She expressed that she loves her baby and that she thought he would be safe with her and his father.

Jennifer House, Kelley's therapist, explained that she began seeing Kelley in April 2022. Kelley's initial mental-health evaluation showed that she needed improvement in coping skills, boundaries, emotional regulation, and substance-use recovery. However, they did not begin counseling sessions until a second mental-health evaluation was done approximately one year later. House noted that Kelley had been in recovery and had begun working on boundaries, support systems, emotional regulation, and anxiety issues. Kelley had several diagnoses, including unspecified schizophrenia spectrum and other psychotic disorder, depression, and PTSD. House had a total of six sessions with Kelley before the termination hearing, and she believed that Kelley had shown progress. House stated that Kelley had shown no sign that she would be a danger to herself or to her child but agreed that she (House) could not speak to Kelley's parenting skills.

4

Shelly Crabill, a program assistant with DHS, testified that she had supervised the visits that Kelley had with MC throughout the pendency of the case. In the beginning, Kelley would "get really bored real quick" and cut her visit short if MC fell asleep. She would also get frustrated easily and did not want to listen to redirection. Recently, Kelley and MC's father had been visiting together, playing with MC, or napping with him if he fell asleep. Crabill said Kelley's behavior had improved, but she still did not bring proper supplies to visits such as a diaper bag or food.

Savannah Chenault, the DHS caseworker, testified that since MC had been removed, Kelley had never had a trial home placement or even an unsupervised visit. While Kelley had made progress with her mental health, she had not remedied the instability that caused removal. Chenault acknowledged that Kelley had shown improvement and stability in the last couple of months, but it was not enough to assure her (Chenault) that MC would be safe with Kelley. Kelley had not begun diligently participating in the case plan until the spring of 2023, around a year after removal, and it had been only six months since her last positive drug screen. Kelley had lived in at least three different places during the pendency of the case in addition to attending rehab and being jailed at least twice. Kelley also had a pending criminal charge. Chenault agreed that there were no other services that could or should have been provided to help Kelley obtain stability and permanency.

Chenault opined that MC is adoptable and that he was currently placed in a foster home with his half siblings.[1] On cross-examination, Chenault reiterated that based on

---

[1]Kelley previously had her rights terminated to three children who were later adopted together.

Kelley's past behavior, giving her a few more months to comply with the case plan would not enable her to remedy DHS's concerns. However, she agreed with parent counsel's statement that "she's doing good enough that you think if she continued on there would be a possibility of reuniting her son with his mom and dad."

David Meeks, MC's foster dad, testified that his family had adopted MC's siblings in 2015 and that MC had been with the family since 28 February 2022. He and his wife were "absolutely" open to adopting MC.

Brandy Reyes, the Conway County DHS supervisor, testified that she has known Kelley around ten years. Reyes explained that Kelley has a long history of mental instability and drug use and that while there are periods of time when she is clean, "those periods don't last." Reyes did not believe the improved stability that Kelley had shown in the past couple of months justified prolonging MC's time in foster care. After Reyes's testimony, the hearing was continued until 11 September 2023.

At the September 11 hearing, Kelley was recalled to the stand and said that since the July 27 hearing, she had been participating in outpatient counseling and in supervised visitation. She wanted the court to expand her visitation to include unsupervised visitation and explained that she could rely on her mother, stepfather, or MC's father if she needed help.

Louise Witcher, a CASA volunteer, testified that Kelley's visitation had improved since February 2023, when she started taking medication. Before her visits had been sporadic, which made it difficult for MC to bond with her. Her visits are now consistent, but while Kelley acknowledges that she loves MC, she does not feel connected to him.

6

In its oral findings, the circuit court found that MC had been out of Kelley's custody for nineteen months. DHS had made a meaningful and reasonable efforts to help Kelley by providing services to remedy the conditions that caused removal, but despite those efforts, Kelley had not remedied those conditions. The court acknowledged that Kelley had made progress in the last few months of the case but found that, overall, it had been a "very chaotic situation during the pendency of this case." The court expressed concern over Kelley's pending felony criminal case for making a fictitious 911 report for which Kelley thought she would receive probation. In addition, Kelley's attorney had filed a motion for a forensic evaluation to support a defense of mental disease or defect, which justified continuing concerns about Kelley's mental health. The court also found credible Witcher's statement that Kelley had not bonded with MC. The court could not safely return MC to Kelley at that time and did not know when that might be possible. The court also found little likelihood of reunification.

The court's written order found that the following statutory grounds had been proved by clear and convincing evidence: failure to remedy, subsequent factors,[2] and aggravated circumstances. The court also found that the evidence proved that termination of parental rights is in MC's best interest. MC is adoptable, in a placement willing to adopt him, and would be subjected to potential harm because Kelley had not resolved the issues that caused removal, had pending criminal charges, and did not have a significant bond with MC. Kelley has timely appealed the circuit court's order.

_____

[2]DHS did not plead this ground in its petition or at the hearing.

7

We review termination-of-parental-rights cases de novo. *Roland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 333, 552 S.W.3d 443. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3)(A), (B) (Supp. 2023). Clear and convincing evidence is proof that will produce in the fact-finder a firm conviction on the allegation sought to be established. *Dinkins v. Ark. Dep't of Hum. Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). On appeal, we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Id.* Only one ground is necessary to terminate parental rights. *Lee v. Ark. Dep't of Hum. Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008).

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Friend v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670. The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. *Lyall v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 81, 661 S.W.3d 240. Even

8

full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for her child. *Shaffer v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 208, 489 S.W.3d 182. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Finally, a parent's past behavior is often a good indicator of future behavior. *Id.*

## I. *Statutory Grounds*

As explained above, the circuit court found three statutory grounds for termination had been proved by clear and convincing evidence, but only one ground is necessary to terminate parental rights. *Lee*, *supra*. We first examine the circuit court's finding that the statutory ground of aggravated circumstances supported the termination of Kelley's parental rights.

A court of competent jurisdiction may terminate parental rights when the parent is found to have subjected any juvenile to aggravated circumstances. Ark. Code Ann. § 9-27 341(b)(3)(B)(ix)(*a*)(*3*)(*A*). As applied in this case, aggravated circumstances means that "a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification." *Id.* § 9-27-341(b)(3)(B)(ix)(*a*)(*3*)(*B*)(*i*). This court has held that a parent's failure to demonstrate "sufficient parenting skills to regain custody of the children or to be trusted with a trial placement or unsupervised visitation" supports an aggravated-circumstances finding. *Jones v. Ark. Dep't of Hum. Servs.,* 2019 Ark. App. 299, at 8, 578 S.W.3d 312, 318. Further, a caseworker's testimony that there are no further services that DHS can provide to reunify a parent with his or her child supports a

9

finding of aggravated circumstances in a termination-of-parental-rights proceeding. *Myers v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 46, 660 S.W.3d 357.

In its order, the court found that MC had been in DHS custody for more than eighteen months, that DHS had provided services to Kelley that were intended to rehabilitate her and remedy the conditions that caused removal and prevented placement with her, and that Kelley had failed to progress on the case plan to a point at which MC could be safely returned to her at the time of the hearing. The court noted that Kelley had begun to work on the case plan only in the last few months, that she had pending criminal charges in which her fitness to proceed is in question, and that she did not have a significant bond with MC. The court concluded that further services to Kelley were not likely to result in a successful reunification within a reasonable period of time as viewed from MC's perspective.

On appeal, Kelley argues that it is undisputed that she had remedied both her drug use and her mental illness, which are the two issues that contributed to her mental instability. Further, she was in a stable relationship with MC's father, who also provided stability. Regarding her bond with MC, she points out that he was removed at birth and that she had been given only weekly four-hour visits, so "it is not unreasonable for there to be bonding complications between a parent and an infant . . . when the parent's visitation is severely limited." While acknowledging that MC loves his foster parents, she asserts that he also knows her and is happy with her. She also cites Chenault's statement that Kelley was doing well enough that with more time, there was a "possibility" of reunification. She concludes

that the record as a whole does not demonstrate "little likelihood" that additional services and continuation of the case would result in successful reunification.

DHS responds that Kelley did not complete a counseling intake and begin services until the case had been open for twelve months. The case law is clear that a parent's eleventh-hour improvements will not outweigh other evidence of her prior noncompliance. *Lyons v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 271. DHS also cites the testimony of Brandy Reyes, the DHS supervisor, who had known Kelley for many years and was not convinced that her recent progress was sustainable. Further, Kelley's caseworker testified that there were no further services that could be provided or had not already been provided to help Kelley. DHS also notes that this court has previously addressed the need for a parent to demonstrate sustained stability:

> Some progress is not always enough. A parent must make enough progress *soon enough* that maintaining it through the end of the case would demonstrate that the parent would remain safe, stable, and sober if the children were returned. The harder a habit is to break, the sooner the parent needs to break it. And few habits are harder to break than methamphetamine use. Appeals where a parent made eleventh-hour progress before her parental rights were terminated are among the hardest we decide. Inevitably, some of them will involve parents who would—and did—maintain their fitness, and could have proved it with more time. But the legal question we must answer is whether the circuit court clearly erred by doubting them on the record it had.

*Wagner v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 400, at 3–4, 675 S.W.3d 469, 472 (emphasis in original). DHS argues that the circuit court here also had reason to doubt Kelley's stability would last.

We hold that the reasoning in *Wagner* holds true in this case as well. Kelley had shown some progress and stability, but her efforts did not begin until MC had been in DHS

11

custody for approximately one year. We likewise cannot agree with the assertion that she had "remedied" her issues with drug abuse and her mental illness after only six months of apparent stability. Both Chenault and Reyes expressed doubt about the permanency of Kelley's rehabilitation, and a parent's past behavior is often a good indicator of future behavior. *Cobb*, *supra*.

At the termination hearing, the circuit court's concern is whether Kelley has progressed to a point at which MC could safely be returned to her at the time of the hearing, and we hold that the circuit court did not err in finding that Kelley had not met that threshold. Chenault testified that there were no other services that DHS could provide to Kelley, and while we acknowledge that Chenault also agreed that there was a "possibility" of reunification if Kelley had been given more time, the standard is whether further services are likely to result in a successful reunification within a reasonable period of time as viewed from MC's perspective. Here, MC had been in DHS custody his entire life, approximately nineteen months, and a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Cobb*, *supra*. We hold that the circuit court's determination that there was little likelihood of successful reunification was not clearly erroneous. Because only one statutory ground need be proved to support termination, we need not address the other statutory grounds found by the circuit court.

II. *Best Interest*

In making a best-interest determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the

12

child if custody is returned to a parent. *Ware v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 480, 503 S.W.3d 874. The potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. The potential-harm analysis is to be conducted in broad terms. *Id.* It is the best-interest finding that must be supported by clear and convincing evidence. *Singleton v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 455, 468 S.W.3d 809.

Kelley does not challenge the circuit court's finding on adoptability. She does, however, argue that the circuit court erred in finding that MC would face potential harm if returned to her. In its order, the circuit court found that MC "would be subjected to potential harm because the mother has not resolved the issues that caused removal, has pending criminal charges, and she does not have a significant bond with the juvenile."

Kelley contends that even conducting the potential-harm analysis in broad terms, the court had absolutely no evidence on which to make a finding that there was a real risk of harm to MC if he had continued contact with his mother or was placed in her care and custody. She suggests potential harm is found in circumstances that create "great potential for instability, such as continued drug use, unstable housing, or uncertain sources of income."

DHS counters that the standard is not an "actual" or "real" risk of harm, but a potential risk of harm, which must be viewed in a forward-looking manner and considered in broad terms. *Pine, supra.* Also, as noted above, a parent's past behavior is often a good indicator of future harm. *Cobb, supra.* In this case, there was testimony about Kelley's

extensive history with mental-health and drug-abuse issues, which inherently pose a threat of potential harm, and given her history, her period of stability was still relatively new. Likewise, her living situation with MC's father, which contributed to her overall stability, had only been in place a few months. Finally, Kelley still had a pending felony criminal charge, and while she believed she would receive a probationary sentence, there was no proof of that.

We hold that the circuit court did not clearly err in finding that termination of Kelley's parental rights was in MC's best interest and, in particular, that MC faced potential harm if returned to Kelley's custody. Overall, the recent stability that Kelley had achieved, while commendable, was not enough to safely place MC in her custody.

Affirmed.

GRUBER and THYER, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.