Cite as 2025 Ark. App. 14

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-530

| | |
|---|---|
| SHANDA THROWER | **Opinion Delivered** January 15, 2025 |
| APPELLANT | APPEAL FROM THE VAN BUREN COUNTY CIRCUIT COURT |
| V. | [NO. 71JV-23-19] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE SUSAN WEAVER, JUDGE |
| APPELLEES | AFFIRMED; MOTION TO WITHDRAW GRANTED |

### STEPHANIE POTTER BARRETT, Judge

Shanda Thrower appeals the Van Buren County Circuit Court's termination of her parental rights to her daughter, MC1, born August 3, 2014.[1] Pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(j) (2023), Thrower's counsel has filed a motion to withdraw as counsel and a no-merit brief listing all rulings adverse to her in the termination hearing and asserting there are no issues that would support a meritorious appeal. Thrower was notified by the clerk of this court of her right to file pro se points, but she has not done so. We affirm the termination of Thrower's parental rights, and we grant counsel's motion to withdraw.

---

[1]Terry Chatman, MC1's father, voluntarily consented to the termination of his parental rights, and he is not a party to this appeal.

The Arkansas Department of Human Services (DHS) removed MC1 from Thrower's custody on March 19, 2023, after Van Buren County deputies were asked to perform a welfare check at Thrower's residence. When they arrived, the deputies found Thrower speaking erratically, claiming that "something" had been planted in her house and that it had been growing and had invaded her mouth, and it was now growing inside of her. Thrower also claimed that someone had planted "bots" inside MC1, and MC1 was being controlled by "Brian Hicks" and by the television. Thrower slapped at imaginary things as she spoke to the deputies, and she told them that she was swallowing "white orbs." The deputies informed the DHS caseworker that it was unsafe for MC1 to remain in Thrower's care given her mental status. Thrower tested positive for THC, and she was arrested for child endangerment. As a result, DHS filed a petition for dependency-neglect and emergency custody on March 22; an ex parte order granting emergency custody to DHS was entered the same day.

A probable-cause hearing was held on March 30. In an order filed on April 19, the circuit court found it contrary to MC1's welfare to be returned to Thrower's custody given the instability of her mental health, and probable cause existed to continue MC1's custody with DHS. Thrower was awarded weekly visitation; and she was ordered to refrain from using illegal drugs and alcohol, to comply with the case plan and court orders, and to cooperate with DHS and all service providers.

In an adjudication order filed May 2, MC1 was adjudicated dependent-neglected by stipulation of the parties. The goal of the case was determined to be reunification with a

2

concurrent goal of adoption. Thrower was ordered to begin counseling immediately; to continue her medication management and follow all recommendations; to participate in an Optum assessment; to submit to a psychological evaluation; to comply with the case plan and court orders; to maintain regular contact with DHS and her attorney and attend all staffings; to refrain from using alcohol and drugs and to submit to random drug screens; to obtain and maintain safe, stable, and appropriate housing; to obtain and maintain employment; to complete parenting classes; and to resolve any outstanding legal issues.

In a review order filed July 7, the circuit court continued MC1's custody with DHS because it was contrary to MC1's welfare to return custody to Thrower; the goal remained reunification with a concurrent goal of adoption. While the circuit court found that DHS had made reasonable efforts to provide services, it found that Thrower had only minimally complied with the case plan and court orders.

A second review order was filed on September 6[2] in which the circuit court found it was in MC1's best interest for her to remain in DHS custody. The goal of the case continued to be reunification with a fit parent with a concurrent goal of adoption. DHS was found to have made reasonable efforts to provide services, but Thrower was noncompliant with the case plan and court orders.

A third review order was filed on September 6. MC1's custody remained with DHS; the goal of the case continued to be reunification with a concurrent goal of guardianship.

---

[2]The second review hearing was held on July 12, but the order was not filed until September 6, the date of the third review hearing.

While the circuit court found that DHS had made reasonable efforts to provide services, it found that Thrower had not complied with the case plan and court orders.

A fourth review order was filed on January 4, 2024. MC1's custody continued with DHS; reunification with a fit parent remained the goal with a concurrent goal of adoption or guardianship. While DHS was found to have made reasonable efforts to provide services, the circuit court found that Thrower was not in compliance with the case plan and court orders. The circuit court noted that Thrower's supervised visitation could be expanded at the discretion of the attorney ad litem and DHS, but it could also be suspended if Thrower acted inappropriately. Thrower was ordered to take her medication.

A permanency-planning hearing was held on March 6,[3] at which time the goal of the case was changed to adoption; the circuit court continued custody with DHS, stating that the parents were unfit, and MC1's health and safety could not be protected if custody was returned to Thrower. The circuit court found that Thrower was noncompliant with the case plan and court orders; her visitation was also suspended in this order.

DHS filed a petition for termination of parental rights on April 7, alleging three grounds for termination: (1) MC1 was adjudicated dependent-neglected and had continued out of Thrower's custody for twelve months, and despite a meaningful effort by DHS, Thrower had not remedied the conditions that caused MC1's removal; (2) other factors arose subsequent to the filing of the petition for dependency-neglect that demonstrated that

_____

[3]The order from this hearing was not filed until May 8.

4

placement of custody of MC1 with Thrower was contrary to her health, safety, and welfare, and despite the offer of appropriate services, Thrower had manifested the incapacity or indifference to remedy the subsequent issues that prevented placement of MC1 in her custody; and (3) Thrower had subjected MC1 to aggravated circumstances, and there was little likelihood that continued services to the family would result in reunification. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*, (vii)*(a)*, (ix)*(a)(3)(A)* (Supp. 2023). DHS further alleged that termination of parental rights and consent for adoption were in MC1's best interest.

The hearing on the petition to terminate parental rights was held on May 8. DHS called caseworker Crystal Ward, who testified that MC1 was removed from Thrower's custody on March 22, 2023, due to Thrower's hallucinations and her inability to care for MC1; and during the pendency of the case, MC1 had never been returned to Thrower's custody, even for a trial placement, because Thrower was unable to stabilize her mental health. Ward explained that Thrower was offered parenting classes; outpatient treatment at Harbor House, from which she was dismissed due to absences; Ideal Option Drug Treatment, which she refused; a psych evaluation; drug screens; home visits; transportation; homemaking skills; trips to the food pantry; clothing vouchers; mental-health services at Conway Behavioral Health; budgeting; family support; and employment services. Ward even cared for Thrower's dog, feeding and checking on it every day, for the week Thrower was a patient at Conway Behavioral Health.

Ward testified MC1 was in a fictive-kin placement, where she had been placed when she was removed from Thrower's custody and where her adult brother also resided. She

believed there were no barriers to adoption of MC1, and her current placement was interested in adopting her if the opportunity became available. Ward said DHS had provided clothing for MC1 as well as counseling and other medical services to assist MC1 in meeting her goals. Visitation had been provided for both parents; while Thrower's visitation had been suspended due to her outbursts in court, MC1 was able to visit with her father—even though he was incarcerated during the case—via Zoom and in person when he was in the county jail.

Ward testified that MC1 had been out of Thrower's custody for more than twelve months, and that, in her opinion, Thrower had not remedied her mental-health issues to the point that it would be safe for MC1 to be returned to Thrower's custody, despite all the services provided by DHS. Thrower had attended less than half of her counseling sessions, and she continued to abuse illegal substances and her prescription medication. Ward explained that when Thrower was taking her medications properly, visitations went well, but when she stopped taking her medications, she would have outbursts and delusions during visitation, which frightened MC1. Thrower's drug screens routinely tested positive for THC; although Ward provided her with an application for a medical marijuana card, Thrower had not completed it. Thrower also tested positive on occasion for methamphetamine, but she always denied having used that substance. Ward was concerned that Thrower often ran out of her medication before it was time for a refill; when Ward would count the medication, Thrower was usually short, indicating that she had taken more than had been prescribed. However, there were also times Thrower refused to take her medications. According to

6

Ward, when Thrower was properly taking her medication, she would converse with DHS employees and have good visitations with MC1, but when she was off her medication, she would sling her arms, curse under her breath, and see things that were not there. Ward said that to her knowledge, Thrower was not employed, and because she did not have a job, she was no longer able to receive assistance with her utility bills from some sources. Ward opined that there were no additional services she could offer Thrower that would lead to a successful reunification with MC1, and she was concerned that if MC1 was returned to Thrower's custody, Thrower would be unable to properly care for MC1, especially without a source of income.

Thrower testified in her own defense. She claimed that while she had a diagnosis of schizophrenia "many years ago," it had been removed, and her latest diagnosis was PTSD with symptoms of bipolar disorder. She admitted that the water at her house had been off for two months, but she explained that the pipes had frozen, and she had been working with a plumber to address the situation. She admitted that there were a "few holes" in her floor, and other items needed to be repaired, but she insisted that her house is livable. When asked who paid for her groceries and utility bills, Thrower said that her "guy friend" was taking care of her. When asked about her failure to complete the Harbor House program, Thrower stated that she did not have a substance-abuse issue; she denied that she used methamphetamine, even though her drug screens had tested positive for it. She explained that she could not afford to obtain a medical marijuana card, but she continued to use

7

marijuana because it helped with her trauma; nevertheless, she asserted that she was "not on drugs."

This court reviews termination-of-parental-rights cases de novo. *Kelley v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 475, 699 S.W.3d 165. For termination, at least one statutory ground must exist, and the circuit court must determinate that it is in the child's best interest to terminate parental rights; both must be proved by clear and convincing evidence, which is proof that will produce in the fact-finder a firm conviction on the allegation sought to be established. *Id.* A circuit court's ruling will not be reversed on appeal unless its findings are clearly erroneous; a finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, the appellate court gives due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Id.*

Counsel first discusses the circuit court's decision that grounds existed to terminate Thrower's parental rights. Proof of only one ground is required to support the circuit court's termination of parental rights. *Shipp v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 230, 599 S.W.3d 149. Although the circuit court terminated Thrower's parental rights on three grounds, counsel chose to discuss the "aggravated circumstances" ground, which includes a determination by the circuit court that there is little likelihood continued services to the parent would result in successful reunification. We agree with counsel that any argument to the contrary with regard to this ground would be wholly frivolous.

Thrower was never in compliance with the case plan or court orders. She was not compliant with her medication, and when she quit taking it, she became irrational and delusional. She completed less than one-half of her counseling sessions; she refused other services offered by DHS; she did not have a source of income throughout the case; she admitted that her house had had no running water for two months and that there were several holes in the floors of her home; and while she admitted continued and regular use of marijuana, she still asserted to the circuit court that she did not use drugs. Ward testified that there were no other services that DHS could offer to assist Thrower than those that had already been offered. An appellant's failure to fully comply with the case plan supports termination based on aggravated circumstances; furthermore, lack of progress regarding drug use, stable housing, or employment supports termination based on aggravated circumstances. *Harlow v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 397.

The circuit court also determined it was in MC1's best interest to terminate Thrower's parental rights. The best-interest analysis includes consideration of the likelihood that the juvenile will be adopted and of the potential harm caused by returning custody to the parent. *Williams v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 162.

A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Cox v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 525, ___ S.W.3d ___. Ward testified that there were no barriers to MC1's being adopted, and the family MC1 had been placed with was interested in adopting her if Thrower's parental rights were terminated. There was no evidence presented to refute this testimony.

As for potential harm, the court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.* The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Id.* A parent's drug use and failure to comply with court orders supports a finding of potential harm. *Id.*

We hold that the evidence clearly and convincingly supports termination, and any argument challenging the statutory grounds or best-interest finding would be wholly frivolous. We affirm the termination of Thrower's parental rights and grant counsel's motion to withdraw.

Affirmed; motion to withdraw granted.

HIXSON and BROWN, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

One brief only.