Cite as 2020 Ark. App. 401

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV-20-180

| | |
|---|---|
| SHARON ANDERSON | **OPINION DELIVERED:** SEPTEMBER 16, 2020 |
| APPELLANT | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70JV-19-19] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE EDWIN KEATON, JUDGE |
| APPELLEES | AFFIRMED; MOTION TO WITHDRAW GRANTED |

## ROBERT J. GLADWIN, Judge

Sharon Anderson appeals the Union County Circuit Court order terminating her parental rights to her four children, N.A., M.A., E.L., and I.C. Pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(i) (2019), Sharon's counsel has filed a motion to be relieved as counsel and a no-merit brief asserting that there are no issues of arguable merit to support an appeal. The clerk of our court sent copies of the brief and the motion to withdraw to Sharon, informing her of her right to file pro se points for reversal pursuant to Rule 6-9(i)(3); however, she has filed no points for reversal. We grant counsel's motion to withdraw and affirm the termination-of-parental-rights order.

### I. *Facts*

This case began on March 1, 2019, when the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect to protect

Sharon's four children, N.A. (born 10/14/2009), M.A. (born 6/09/2015), E.L. (born 11/18/2005), and I.C. (born 2/10/2003). Jamie Anderson is the father of N.A. and M.A. and stepfather of E.L. and I.C. The petition alleged that the juveniles or a sibling had been neglected, sexually abused, and subjected to parental unfitness.

The attached affidavit states that Jamie called police after Jamie and a child argued, Jamie spanked her, and the child fought back. Both the parents and the children were interviewed, and the sexual-abuse allegations were made by the two oldest children, Jamie's stepdaughters. A DHS family service worker (FSW), Traylor, was assigned to complete a safety assessment related to the allegations made by the stepdaughters. When questioned, Sharon said that she had not been aware of any sexual abuse until police came to her home that day. She said that her husband would go into their bedroom with one daughter and close the door to watch a movie, but she did not think anything of it. The children stated that Sharon had been in the bed while Jamie was sexually abusing them.

During an interview, the two oldest children said that Sharon did not know anything about the abuse. They said that it was true their mother had been in the bed at times but that she would be asleep while Jamie sexually abused them. They said that the first time she was told, the police were called to their home. I.C. said that if her mother had known, she would have protected them. E.L. said that her stepfather had been touching her private areas for "a long time" and that in the middle of the night, he would come to her room and put his fingers in her vagina. Jamie said that I.C. made the allegations because she was mad that he had grounded her. I.C. made further allegations about "kissing his thing" and "get[ting] on top of him and put[ting] his private parts inside her private part." It was also alleged that Jamie had hidden a methamphetamine pipe inside a rag somewhere in the house

2

or car. The two girls were taken to the hospital and then examined at CACD. Jamie was charged with two counts of rape and two counts of first-degree sexual assault. After Sharon was interviewed, she was arrested and charged with permitting abuse of a minor, and the children were taken under a seventy-two-hour hold. An ex parte order was filed on March 4, and DHS was granted emergency custody based on the sexual-abuse allegations. On April 8, an order was filed finding probable cause for the children to remain in DHS custody.

Following a hearing on April 15, the circuit court found by clear and convincing evidence that Jamie had sexually abused his stepdaughters. On April 30, DHS filed a petition for termination of Jamie's parental rights to his two biological children based on statutory grounds related to sexual abuse of the children.

An adjudication and disposition order was filed on May 2. It found that the children were at substantial risk of serious harm as a result of Jamie's sexual abuse of the oldest two children and Sharon's allowing it. The order states, "There was plenty of information before the Court that a reasonable person would have known the sexual abuse was going on. . . . Mom's admission to sheriff's lieutenant was that she knew. The court also finds aggravating circumstances as to Jamie Anderson's sexual abuse of [I.C.] and [E.L.]. The Court makes these findings by clear and convincing evidence." It was ordered that the children remain in DHS custody. The goal of the case was reunification with Sharon. Sharon was allowed supervised visitation with the two youngest children, but the court declined to overrule a no-contact order from criminal court regarding I.C. and E.L. Sharon was ordered to follow the case plan; obtain and maintain stable employment; complete parenting classes; undergo a psychological evaluation; attend and participate in individual counseling; and attend

3

counseling with children if recommended and if the no-contact order was lifted. Sharon was also ordered to have a hair-follicle drug screen and, if positive, random drug screens.

Jamie's parental rights were terminated on June 24. A review hearing was held on July 1, and the resulting order reflects that the children were to remain in DHS custody and that Sharon was unfit and could not protect the children. The goal of reunification remained, and it was found that DHS had made reasonable efforts to provide services by providing a psychological evaluation, supervised visitation, counseling, foster care, any necessary referrals, worker visits, and casework management. Sharon was granted supervised visitation, and the court found that Sharon had complied with the case plan and had demonstrated progress.

DHS filed a petition for termination of Sharon's parental rights on October 7. DHS alleged the statutory grounds of aggravated circumstances in that there was little likelihood that services would result in reunification; subsequent factors in that Sharon had manifested an incapacity or indifference to remedy the subsequent issues which prevented placement with her; and abandonment. DHS alleged that Sharon did not go to counseling; did not have a safe home for the children; did not provide proof of employment; moved to Ft. Smith and was living in a van; was in a relationship with Michael Higgs, who was believed to have a criminal record and had not submitted to background checks; had no vehicle and became stranded in Ft. Smith; had no address; and had not visited the children since September 10, 2019.

At the December 2 termination hearing, Mydeana Bridges, supervisor for Union County Division of Child and Family Services, testified that the case opened when Sharon was living in Calion, Arkansas. However, during the case, Sharon moved to Ft. Smith and

4

lived in a van on a campsite. She said that Sharon could not provide an address but was currently living with her grandparents in Quitman, Texas. Bridges also said that Sharon's grandfather may have sexually abused Sharon as a child. During the case, Sharon had four jobs. She worked at a chicken plant in Arcadia, Louisiana; Jennifer's Farms in Texarkana; Elite Comforts in Ft. Smith; and Pro Tech in Quitman, Texas. Bridges said that Sharon no longer has a vehicle, that the man she is seeing, Michael Higgs, is now in the Union County Detention Center, and that Sharon quit complying with the case plan after she began seeing Higgs. Bridges said that Sharon had lost her job and that most of the time DHS could not make contact with her. Bridges testified that Sharon changed her name to "Higgs" on her social media profile and that Higgs is Sharon's fiancé. Bridges said that the children have been out of Sharon's custody since February 26, 2019, that Sharon completed her psychological evaluation, which recommended that she have ongoing counseling, and that she is not actively participating in that. The psychological report found that Sharon's judgment is poor with limited insight and that she lacks skills necessary to change her situation, and this was to be addressed in counseling. Bridges said that Sharon filed for divorce from Jamie and that Sharon told the evaluator that she did not know about the abuse, but at the adjudication hearing, she had said the opposite. Bridges testified that Sharon did not appear for counseling on November 2 and that she missed twenty-three visits with the children. Over the course of the case, she visited them ten times.

Kayla Griffith, a DHS adoption supervisor, testified that there were no barriers to adoption. She said that there were forty-eight families that would consider adopting the sibling group. Griffith also said that the foster parents may consider adoption.

Sharon testified that she lives with her grandparents in Quitman, Texas. She admitted that she had missed visitation and said that three or four times she would call if she was going to be late, and she was told not to come at all. She also said she had car trouble and did not have a ride. She testified that she had lived in Texas for a month and that she did not know the address before the day of the hearing. She said that her grandparents did not know it either because it is "just numbers" with no street name. She gave her phone number but stated she did not always have minutes on her phone. She said she had been trying to look for a job and that she had worked in Ft. Smith for two weeks then moved to Texas. She had known Higgs for three months on Facebook, then dated him a week, and then moved to Ft. Smith with him. She did not appear at the last court date for this case, even though she knew about it—she said she had been with Higgs.

The circuit court ruled:

The Department can't provide services that would result in reunification to this mother based on her unavailability, her not going to counseling, her decision making, her instability. There would be a substantial risk of harm to the children. She couldn't feed them, clothe them, not to mention I can't find that the issue—I guess there has been some visitation going on but she's missed quite a bit of that even, due to her unavailability. Testimony was twenty-three missed visits since visitation started. The court would grant the petition to terminate the mother's parental rights as to N.A., M.A., E.L., and I.C. That would be in the children's best interests. The court makes these findings by substantial evidence.

On December 17, 2019, the court filed a termination-of-parental-rights order, finding by clear and convincing evidence that Sharon had subjected the children to aggravated circumstances in that there was little likelihood that services to the family would result in successful reunification. The court found that it was in the children's best interests that Sharon's parental rights be terminated, that the children would likely be adopted, and that they would be subjected to potential harm if returned to Sharon.

6

## II. *Standard of Review and Applicable Law*

We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2019); *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Gray v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 24. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

Pursuant to *Linker-Flores*, our rules were created to ensure that someone who is advocating on behalf of the appellant has reviewed the record and considered all the arguments that could be made in the client's favor before a no-merit brief is submitted. *Kloss v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 121, at 5. Counsel has a duty to address all adverse rulings and to explain why each ruling is not a meritorious ground for reversal. Ark. Sup. Ct. R. 6-9(i)(1)(A).

## III. *Argument*

Counsel contends that any challenge to the court's determination that statutory grounds existed under Arkansas Code Annotated section 9-27-341(b)(3)(B) for termination

of Sharon's parental rights has the least potential for arguable merit in this appeal. Only one ground is necessary to terminate parental rights. *Lee v. Ark. Dep't of Human Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008). We agree with counsel's contention. It is indisputable that aggravated circumstances—little likelihood that further services would result in reunification—was demonstrated. Sharon had not complied sufficiently with the court's orders or the case plan to continue with services, as she had not attended counseling in order to address the abuse that was perpetrated on her girls, she had been living in a van with a man she barely knew, she had an unstable living situation that prevented continued services, she provided no information about her current living situation that DHS could assess prior to the termination hearing, and she had missed twenty-three visits.

The evidence also demonstrates that termination was in the children's best interest. There was uncontroverted evidence about adoptability—forty-eight families would consider adopting a sibling group, and the foster parents would consider it. *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005). Further, the evidence presented actually identified particular harms that would put the children at risk— Sharon was unable to feed, clothe, or provide medical care for her children, and the court had concerns about her ability to protect them due to her lack of insight as noted in the psychological evaluation. *Latham v. Ark. Dep't of Human Servs.*, 99 Ark. App. 25, 256 S.W.3d 543 (2007).

IV. *Nonmeritorious Issue Not Discussed*

Counsel did not discuss the standard by which the circuit court found the necessary grounds for termination in its ruling from the bench. Even if an adverse ruling is omitted from a no-merit brief in a termination case, we may affirm if the ruling would clearly not

8

constitute a meritorious ground for appeal. *Houseman v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 227, at 10, 491 S.W.3d 153, 159. The circuit court stated in its ruling from the bench that it found the necessary statutory grounds for termination by "substantial evidence." But the written order used the correct burden, "clear and convincing evidence." To the extent that the circuit court's bench ruling conflicts with its written order, if at all, the written order controls over the court's oral ruling. *Bennett v. Bennett*, 2016 Ark. App. 308, at 6–7, 496 S.W.3d 409, 413 (citing *Stills v. Stills*, 2010 Ark. 132, at 12, 361 S.W.3d 823, 830).

## V. *Conclusion*

Having carefully examined the record and counsel's brief, we conclude that counsel has complied with the requirements established by the Arkansas Supreme Court for no-merit termination cases and that the appeal is wholly without merit. Accordingly, we grant counsel's motion to withdraw and affirm the order terminating Sharon's parental rights.

Affirmed; motion to withdraw granted.

VIRDEN and WHITEAKER, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

One brief only.