Cite as 2024 Ark. App. 488

# ARKANSAS COURT OF APPEALS
DIVISION I

No. CV-24-274

| | |
|---|---|
| BRITTANY PARKS | Opinion Delivered October 9, 2024 |
| APPELLANT | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26JV-22-253] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE LYNN WILLIAMS, JUDGE |
| APPELLEES | AFFIRMED |

**RITA W. GRUBER, Judge**

Brittany Parks appeals the February 21, 2024 Garland County Circuit Court order terminating her parental rights to MC1 (male, born in 2020) and MC2 (female, born in 2022).[1] On appeal, Brittany contends that the Arkansas Department of Human Services (DHS) did not prove by clear and convincing evidence the statutory grounds for termination and that termination is in the children's best interests. We affirm.

I. *Background*

---

[1]The order also terminated the parental rights of MC1 and MC2's father, Kevin Parks, who is not a party to this appeal.

On August 23, 2022, DHS exercised emergency custody of MC1 and MC2 due to Brittany's ongoing illegal drug use.[2] Brittany had tested positive for methamphetamine, amphetamine, and THC at the time of MC2's birth—her second Garrett's Law[3] case. On August 26, DHS filed a petition for emergency custody and dependency-neglect based on abuse, parental unfitness, and neglect.

The petition was supported by an affidavit by family service worker Jody Smallwood. The affidavit set forth the specifics of Brittany's ongoing illegal drug use and DHS's history with the family. Specifically, there had been a true finding under Garrett's Law in July 2020 with respect to MC1, who was in foster care from birth until January 5, 2022, when he was returned to his parents' custody. The affidavit also set out that the children's legal father is Brittany's husband, Kevin Parks.

On August 26, 2022, the circuit court entered an order granting DHS's request for emergency custody. On August 31, the circuit court entered a probable-cause order determining that probable cause existed to continue custody of the children with DHS. On October 14, an order was entered appointing a CASA. The circuit court entered an agreed

---

[2]Brittany's oldest child—MC3—was also taken into DHS custody. However, MC3 was ultimately placed in the custody of her biological father, who is not Kevin Parks. The case was closed as to MC3, and she is not the subject of this appeal.

[3]Garrett's Law, codified at Ark. Code Ann. § 9-27-303(37)(B)(i)(a)–(b) (Supp. 2023), provides that neglect includes causing "a child to be born with an illegal substance present in the child's bodily fluids or bodily substances as a result of the pregnant mother's knowingly using an illegal substance before the birth of the child" or at "the time of the birth of a child, the presence of an illegal substance in the mother's bodily fluids or bodily substances as a result of the pregnant mother's knowingly using an illegal substance before the birth of the child."

adjudication order on October 14, finding that the children were dependent-neglected due to parental unfitness due to substance abuse. The circuit court set a goal of reunification with a fit parent with a concurrent goal of placement with a relative or fictive kin. The court ordered Brittany in relevant part to follow the case plan; to obtain and maintain a safe, suitable, and appropriate home free from illegal substances and other health and safety hazards; to demonstrate stability and the ability to provide for the health, safety, and welfare of the children; and to participate in any services requested by DHS.

An agreed review order was entered January 20, 2023. The circuit court continued custody of the children with DHS because the parents had not been compliant with the case plan and continued the goal of reunification with a fit parent with a concurrent goal of placement with a relative or fictive kin. Another agreed review order was entered May 8. The circuit court once more continued custody of the children with DHS because the parents had not been compliant with the case plan. The circuit court also continued the goal of reunification with a fit parent with a concurrent goal of placement with a relative or fictive kin. The circuit court found that DHS had complied with the case plan and orders of the court and had made reasonable efforts. The circuit court continued its previous orders regarding Brittany and Kevin.

The permanency-planning order was entered on September 5, 2023. The circuit court found that Brittany and Kevin had been partially compliant with the case plan, each having completed inpatient drug treatment in July 2023. However, since then, neither had participated in outpatient treatment or submitted to random drug screens, and neither had

stable housing. The court continued custody of the children with DHS. Having found that neither parent had made significant, measurable progress on the case plan, the circuit court changed the goal of the case to adoption following termination of parental rights. The circuit court found that DHS had complied with the case plan and the court's orders and had made reasonable efforts to provide family services.

On September 19, 2023, DHS filed a petition to terminate Brittany's and Kevin's parental rights to MC1 and MC2. The petition alleged that termination would be in the children's best interest and that pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2023), the children had been adjudicated dependent-neglected and had continued out of the custody of the parents for twelve months, and despite a meaningful effort by DHS to rehabilitate the parents and correct the conditions that caused removal, those conditions had not been remedied by the parents. Brittany responded to the petition on September 22, requesting that the petition be denied.

On December 11, 2023, the circuit court denied without prejudice the petition to terminate. The circuit court ordered MC1 and MC2 to remain in DHS custody; the parents to continue to follow the case plan; and DHS to continue offering services. The goal of adoption following termination of parental rights was continued.

On December 12, 2023, DHS once more petitioned to terminate Brittany's and Kevin's parental rights to MC1 and MC2. The petition again alleged the failure-to-remedy ground and that termination would be in the children's best interest. The termination hearing was held on February 7, 2024. The court took testimony from Dr. Jessica Cannon

4

(MC1's pediatrician); Tonya Ross (MC1 and MC2's foster mother); Seth Draper (caseworker); Susan Miller (adoption specialist); and Brittany. The court admitted DHS's court report; the CASA report; Brittany's September 22, 2023 hair-follicle test; and Kevin Parks's November 21, 2023 hair-follicle test into evidence.

Dr. Jessica Cannon testified regarding MC1's "severe autism" and the intensive caretaking and supervision he requires and will likely always require due, in part, to his being nearly nonverbal and an elopement risk. She further testified about her concerns regarding returning custody of MC1 to his parents, given his medical issues and their history of substance abuse.

Tonya Ross testified that MC1 was first placed in her home when he was two or three days old upon being discharged from the hospital. He was reunified with Brittany when he was sixteen months old. When MC2 was born in August 2022, both children were placed in her home, and the children have been in her home since then. She further testified regarding MC1's behaviors because of his autism and the level of care and constant attention required by his caretaker.

Caseworker Seth Draper testified regarding the circumstances under which both children had come into DHS custody. Specifically, he testified that DHS already had an open protective-services case regarding the family and MC1 pursuant to Garrett's Law due to Brittany's methamphetamine use. Brittany was admitted to an inpatient rehab facility that would allow her to take MC2 with her; however, she left the rehab facility shortly thereafter, which is when DHS placed the seventy-two-hour hold on the children. Brittany completed a

5

drug-and-alcohol assessment that recommended inpatient drug treatment; DHS tried to get Brittany into inpatient drug treatment multiple times, and she did eventually complete inpatient treatment on July 13, 2023. The inpatient program recommended follow-up outpatient treatment; Brittany was aware of that recommendation because Draper had discussed that with her; however, she was not participating in any counseling at the time of the hearing and had not participated in any outpatient treatment since her discharge from inpatient treatment. Brittany had relayed to him that she either does not think she needs further treatment or is uncomfortable with certain providers. In his experience, a big part of maintaining sobriety is engaging in some sort of outpatient treatment or group sessions because they help maintain accountability. Brittany had also completed psychological evaluations with multiple recommendations, but she completed only the recommended parenting class. She was enrolled in standard counseling but was discharged due to noncompliance.

Draper testified further that Brittany submitted to a hair-follicle test administered by DHS on September 22, 2023, that was positive for amphetamine and methamphetamine. Thereafter, Brittany had an independent hair-follicle test conducted that, to Draper's knowledge, was negative. Brittany was inconsistent in showing up for drug screens; however, the ones she had submitted to—which typically occurred during her regularly scheduled visitation—were negative. Overall, she was noncompliant in submitting to random drug screen.

Draper explained that Brittany was employed cleaning houses and was currently residing in the basement of a friend who is also her boss. Draper conducted a home visit and had concerns with the space and stairs in connection with MC1's autism and the complete lack of baby proofing necessary to keep MC1 safe as well as the lack of a defined space for MC2. While Brittany told him that she was going to be leasing a different space and the water would be turned on the coming Friday, Draper did not believe this was in compliance with the court's previous order that Brittany obtain and maintain safe, suitable, and appropriate housing. Draper had discussed with Brittany the high level of care that MC1 requires, and she denied that MC1 requires such a high level of care.

Draper did not believe that Brittany had made substantial progress, and he was concerned about her ability to remain sober, given that this was MC1's second time in foster care and that MC1 had been placed in foster care both times due to Brittany's illegal drug abuse. Draper explained that he believed it was in the children's best interest for Brittany's rights to be terminated because the children needed permanency, and MC1 had been in foster care "over a thousand days" and MC2 had been in foster care for "over 500 days."

Susan Miller, adoption specialist with DHS, testified that there were forty-one possible matches for the sibling group and that the foster parents were also willing to adopt the children.

Brittany testified that she was getting ready to move the following Friday and requested more time to get moved in and allow DHS to review the new home. She understood the outpatient recommendations, but her job has inconsistent hours, and she

attends NA meetings when she can to stay on top of her recovery. She had a negative hair-follicle test that covered the same period of time as DHS's positive hair-follicle test. She does online therapy, but she can arrange to do the outpatient therapy. She explained that it took so long for her to complete her inpatient treatment because she did not want to return to Harbor House because it was overwhelming, and she was waiting on her insurance to change so she could go to a different rehab facility. She testified that she had been clean and sober since June 15, 2023. She plans to handle MC1 with "lots of patience" and observe what he does so that she can learn how to "accommodate" him.

On February 14, 2024, the order terminating Brittany's parental rights was entered. The circuit court found that DHS had proved the failure-to-remedy ground. In support of that ground, the court made the following findings. MC1 and MC2 were adjudicated dependent-neglected on October 5, 2022, on the basis of parental unfitness due to Brittany's substance abuse. DHS made a meaningful effort to provide appropriate family services. But the conditions that caused MC1 and MC2 to be removed from Brittany's custody had not been remedied. While Brittany completed inpatient treatment, she had not participated in the outpatient therapy recommended upon her discharge; her last hair-follicle test conducted by DHS was positive for methamphetamine; and she had neither been compliant with random drug screens nor completed the counseling recommended in her psychological evaluations. She still did not have appropriate and stable housing even though the case had been open for over seventeen months and despite the court's denying DHS's first petition to terminate parental rights, in part, to give her additional time to acquire stable housing.

The circuit court found that Brittany had not made sufficient progress, and MC1 and MC2 needed permanency.

The circuit court also found that termination was in the children's best interest, considering potential harm and adoptability. The court found that the children are adoptable because there are forty-one families interested in adopting a sibling group that shares characteristics with them, and the current foster placement is interested in adopting them as well. The court found that the children would be subjected to potential harm if returned to Brittany's custody because there was no evidence that there had been any substantial change in her situation since the removal. Brittany's behavior during this case indicated that she would not appropriately care for MC1 and MC2 if they were placed in her care. The facts supporting the grounds for termination of parental rights also demonstrate how the children would be at risk of harm if returned to Brittany's custody. Moreover, MC1's pediatrician testified that MC1 had been diagnosed with Level 3 autism, and he requires extensive therapy and constant supervision. Accordingly, placing MC1 in the parents' care would put MC1 at serious risk of harm. This timely appeal followed.

II. *Standard of Review*

Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights. *Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374, at 5, 554 S.W.3d 285, 289. However, the intent behind the termination-of-parental rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home

9

cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3); *Lyall v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 81, at 15, 661 S.W.3d 240, 250. As such, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Bentley*, *supra*.

To terminate parental rights, DHS must prove, by clear and convincing evidence, that a minimum of one statutory ground exists and that it is in the child's best interest to do so. Ark. Code Ann. § 9-27-341. Clear and convincing evidence is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Bentley*, 2018 Ark. App. 374, at 4–5, 554 S.W.3d at 289. In finding that termination is in the best interest of the child, the circuit court is required to consider the likelihood that the child will be adopted if the petition is granted and the potential harm to the health and safety of the child that might result from returning the child to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3)(A). It is the overall evidence—not proof of each factor—that must demonstrate that termination is in the child's best interest. *Cole v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 481, at 9, 611 S.W.3d 218, 223. This court has held that other factors to be considered in making a best-interest finding may include whether the children are living in continued uncertainty. *Id.* at 11, 611 S.W.3d at 224.

The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Bentley*, 2018 Ark. App. 374, at 14, 554 S.W.3d at 294. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Id.* A parent's past behavior is often a good indicator of future behavior and

may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Shawkey v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 2, at 6, 510 S.W.3d 803, 807. Even full compliance with the case plan is not determinative; the issue is whether the parent is a stable, safe parent able to care for his or her child. *Lyall*, 2023 Ark. App. 81, at 15, 661 S.W.3d at 250. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.*

We review termination-of-parental-rights cases de novo. *Bentley*, 2018 Ark. App. 374, at 4, 554 S.W.3d at 289. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* at 5, 554 S.W.3d at 289. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

### III.  *Statutory Grounds*

Brittany first contends that the circuit court clearly erred in finding statutory grounds for termination. She argues that DHS failed to prove that she was still actively using illegal drugs at the time of the termination hearing. She further argues that failure to complete outpatient treatment, to appear for random drug screens, and to have sufficiently safe housing coupled with the circuit court's oral ruling that she was not credible is altogether insufficient to support the termination of her parental rights. Brittany also argues that MC1's autism may not be considered under the statutory ground pled by DHS.

11

To prevail on the failure-to-remedy ground, DHS must demonstrate (1) the child was adjudicated dependent-neglected; (2) the child remained out of the custody of the parent for twelve months; (3) the parent failed to remedy the cause of the removal; and (4) this failure occurred despite meaningful efforts by DHS to rehabilitate the parent and correct the issue that caused the removal. Ark. Code Ann. § 9-27-341(b)(3)(B)(i) (Supp. 2023).

The children were taken into DHS custody on August 23, 2022, due to Brittany's drug use. They were adjudicated dependent-neglected on October 14, 2022, and Brittany's rights were terminated on February 14, 2024. The circuit court consistently ordered Brittany to remain drug-free, follow the case plan, submit to drug screens, complete drug treatment, demonstrate stability, and engage in any services that DHS requested.

Brittany did not complete inpatient drug treatment until July 13, 2023—nearly a year after the children had been taken into DHS custody. She had a positive hair-follicle test as recently as September, and there was testimony that she was avoiding random drug screens.[4] *See, e.g., Myers v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 46, 660 S.W.3d 357 (affirming termination under the failure-to-remedy ground due to appellants' failure to submit to random drug screens and failure to acknowledge substance abuse problems).

Brittany argues that the circuit court erred by considering the positive hair-follicle test administered through DHS rather than considering the negative hair-follicle test that she

---

[4]Brittany also remains married to Kevin, who did not appear at the termination hearing. There was testimony that Kevin had been largely noncompliant, including avoiding visitation and random drug screens but having had a positive hair-follicle test result; failing to participate in services; and remaining unemployed.

took on her own, which was neither admitted into evidence nor found elsewhere in the appellate record. Moreover, this argument is nothing more than a request to reweigh the evidence, which we will not do. *See, e.g., Glover v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 278, at 10–11, 577 S.W.3d 13, 20 ("It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court.").

The circuit court ruled from the bench that it found DHS's testimony credible and Brittany's testimony not credible. Brittany argues that the written order controls, and because the written order contains no specific credibility findings, there were none. The written order controls only if there is a conflict between the written order and the oral ruling. *See, e.g., Anderson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 401, at 10, 608 S.W.3d 915, 921 ("To the extent that the circuit court's bench ruling conflicts with its written order, if at all, the written order controls over the court's oral ruling."). Here, there is no conflict, and Arkansas appellate courts have repeatedly held that an oral ruling may inform the appellate court on the circuit court's intentions behind its written order. *See, e.g., Bevell v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 138, at 9, 662 S.W.3d 259, 265 (consideration of oral findings is appropriate in determining the intent of a court's written order).

The circuit court consistently found that DHS made meaningful efforts to reunify Brittany with her children. Despite the provision of appropriate family services by DHS, Brittany repeatedly failed to comply with the case plan and court orders. There was insufficient proof of sobriety that could be relied on, particularly taking into consideration the extensive history of substance abuse by Brittany, which had resulted in two separate

13

dependency-neglect cases. The caseworker's credited testimony was that outpatient treatment is part of substance-abuse treatment, and Brittany failed to participate in it. As to Brittany's argument that MC1's autism may not be considered under the statutory ground pled by DHS, the circuit court did not do so. Rather the circuit court properly considered MC1's caretaking needs under the best-interest analysis. Thus, we hold that the circuit court did not clearly err in concluding that DHS proved statutory grounds.

IV. *Best Interest*

Brittany does not challenge the adoptability finding of the best-interest analysis—only potential harm. The circuit court found that MC1 and MC2 would be subjected to potential harm if returned to Brittany's custody because there was no evidence that there had been any substantial change in her situation since the children's removal, and her behavior during the case indicated that she would not appropriately care for the children if they were returned to her custody. The circuit court further found that it was not in the children's best interest to be returned to Brittany's care because the facts supporting the statutory ground for termination also demonstrated that the children would be at risk of harm if returned to her custody. The circuit court also found that in light of MC1's pediatrician's testimony that MC1 has been diagnosed with Level 3 autism and would continue to require extensive therapy and constant supervision, placing MC1 in Brittany's care would put him at serious risk of harm.

Brittany argues that she should not be punished for what she characterizes as her "slight lapses in judgment." She contends that she has no proven drug use for months and

14

has a plan for independent housing despite receiving no assistance or services from DHS to support her. She argues that her situation with her children is not as egregious as in other cases where, for example, there was physical or emotional abuse, drug or alcohol abuse, parental indifference, abandonment, severe psychological disturbances, or environmental neglect, all of which are, according to her, absent here. She argues that the evidence proved that after inpatient drug treatment, she discontinued her drug use, exercised visitation without issue, has employment, and has completed parenting classes. She contends that she is sober and able to take care of MC1's special needs by exercising patience.

A parent's drug use and failure to comply with court orders supports a potential-harm finding. *Furnish v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 511, at 13, 529 S.W.3d 684, 691 (continued drug use itself is sufficient to support the circuit court's finding of potential harm); *Myers*, 2023 Ark. App. 46, at 17, 660 S.W.3d 357, 369 (a demonstrated lackadaisical approach to following court orders is sufficient evidence of potential harm). Brittany's argument is another request to reweigh the evidence, which we will not do. *See Glover*, *supra*. While Brittany appears to contend that DHS failed to prove potential harm because DHS did not offer her appropriate services during the case, we have repeatedly rejected this argument because a best-interest finding does not require evidence of reasonable efforts. *Belt v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 315, at 10, 603 S.W.3d 203, 209. Alternatively, even if DHS were under some obligation to provide Brittany with specific services related to the court's best-interest finding, the court repeatedly found that DHS had made reasonable efforts, and Brittany did not contest these findings. *See, e.g.*, *Phillips v. Ark. Dep't of Hum.*

15

*Servs.*, 2018 Ark. App. 565, at 11, 567 S.W.3d 502, 509 ("We will not address an argument that DHS failed to make meaningful efforts to reunify the family when the appellant did not appeal from an earlier permanency-planning order."). Thus, we hold that the circuit court did not clearly err in concluding that DHS proved that termination was in the children's best interest.

The circuit court consistently ordered Brittany to remain drug-free; follow the case plan; submit to drug screens; complete drug treatment; demonstrate stability; maintain safe, suitable, and appropriate housing; and engage in any services that DHS requested. Brittany has failed to do so either timely or consistently. MC1 needs constant and continual caretaking, therapies, and heightened home safety. Both children have been in foster care nearly their entire lives and deserve permanency and stability. As such, we affirm the circuit court's order terminating Brittany's parental rights to MC1 and MC2.

Affirmed.

HARRISON, C.J., and THYER, J., agree.

*Dusti Standridge*, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.