Cite as 2024 Ark. App. 525

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-24-184

| | |
|---|---|
| TAMELA COX AND ADRIAN BENNETT | Opinion Delivered October 30, 2024 |
| APPELLANTS | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TENTH DIVISION [NO. 60JV-20-728] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE SHANICE JOHNSON, JUDGE |
| APPELLEES | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Tamela Cox and Adrian Bennett appeal the Pulaski County Circuit Court's termination of their parental rights to their daughters, MC2 (DOB 10/25/08), MC3 (DOB 04/05/11), and MC4 (DOB 12/22/13).[1]  Although Cox and Bennett filed separate briefs on appeal, they both argue that it was not in their daughters' best interest for their parental rights to be terminated.  We affirm the terminations.

---

[1]At the time the case was opened, Bennett was listed as the putative father of MC1 (DOB 01/06/07) and MC2, but the circuit court ultimately found that DNA testing established that he is the biological father of MC1 and MC2.  Cox's and Bennett's parental rights were not terminated as to their daughter MC1.  Cox also has an older daughter who was initially taken into DHS custody but turned eighteen during the case and requested to be dismissed from the case, which the court granted in the permanency-planning order filed on April 25, 2022.

According to affidavits attached to the petition for ex parte emergency custody filed on October 29, 2020, the family had an extensive history with the Arkansas Department of Human Services (DHS). On October 21, 2020, the child-abuse hotline received a report that thirteen-year-old MC1 had been forced to have sex with a twenty-six-year-old man on several occasions in the last month, and she had been having sex with other adult males; Bennett was receiving money for her sexual encounters; and she was engaging in self-harm. In response to the allegations, Bennett told the family-service worker (FSW) that MC1 ran away when she did not get her way, he could usually find her, and he made police reports when MC1 ran away; he admitted knowing that MC1 was having sex with adult men, two of whom he knew, and that some of the men had threatened MC1, but he denied that he sex trafficked MC1. Bennett said that he got MC1 a pregnancy test and attempted to admit her to a mental-health hospital when he learned she was having sex. Cox told the FSW that MC1 was always running away, and she "supposed" MC1 was having sex because she kept coming home with STDs, but she denied knowing anything about sex trafficking. Cox refused to take a drug screen, admitting that she had used THC and cocaine the day before. MC2, MC3, and MC4 all told the FSW that they felt safe at home, and they denied being touched in a sexual manner or being asked to perform sexual acts. They agreed MC1 ran away "a lot." A second affidavit from another FSW included allegations of educational neglect and sexual abuse. A third affidavit from an investigator for the Crimes Against Children Division of the Arkansas State Police (CACD) stated that MC1 frequently ran away from home; she had an extensive history of sexual abuse with multiple offenders beginning

2

when she was nine; it was suspected that she was currently having sex with adult men; and she had multiple STDs, including gonorrhea and chlamydia, which had gone untreated because she was a runaway.

The North Little Rock police located MC1 on October 21 at a house in North Little Rock, and she agreed to go to the Child Protection Center (CPC). When Cox was notified MC1 had been located, Cox refused to go to the CPC, stating that she did not have a ride, and she did not want to deal with MC1. In a videotaped interview, MC1 said that she and her cousin had been staying at the home of her thirty-three-year-old "uncle," although she could not remember how to pronounce his name. She said that Cox blamed her for DHS being in their lives, and that if she told the truth, her parents got upset. She said that her parents smoke marijuana, and her mother takes pills. MC1 proceeded to talk about her "uncle"; she said that while he did not try to have sex with her, he had grabbed her and her cousin by their throats. MC1 also told the investigator that she and her thirty-six-year-old boyfriend had engaged in sex more than six times; she had been raped at least four times; and her parents had received $200 in exchange for her performing sexual acts with men.

Bennett denied trafficking his children, although he admitted he knew the man MC1 claimed had paid $200 to have sex with her. He stated that MC1's "uncle" was married to his niece and that MC1 knew her thirty-six-year-old boyfriend because he had dated Cox while Bennett and Cox were separated.

Forensic interviews were conducted with MC2, MC3, MC4, and Cox's older daughter. MC2, who said she did not attend school, said that MC1 ran away often. MC3

reported that she had not been hurt or inappropriately touched, although she did get "whoopings" with a switch; the police were often called to their house; and that MC1 ran away often. MC4 knew that MC1 was at CPC because MC1 had run away; that MC1 smoked weed; that nothing bad had happened to MC4; and that while she had been spanked with belts and switches, she had not had a spanking in a long time. Cox's oldest daughter denied being hurt at home, but she admitted that Cox and Bennett fought often and that it was a toxic relationship; she believed they needed counseling.

The children were removed from Cox and Bennett because the circumstances presented an immediate danger to their health and physical well-being; they had not, could not, or would not provide the necessary supervision to protect the children from potential harm; and their substance abuse seriously affected their ability to care for the children. It was noted that Cox did not want to deal with MC1 and that sexual abuse was suspected, suggesting that child safety may be an immediate concern.

On October 29, the circuit court entered an ex parte order placing emergency custody with DHS, finding that it was contrary to the children's welfare to remain with their parents. The circuit court specifically found that the children were at risk of substantial harm due to suspected sexual abuse and drug use.

A probable-cause hearing was held on November 4. Testimony revealed ongoing concerns regarding drug use by Cox and Bennett and their refusal to submit to drug screens, concerns of sexual abuse to MC1, and the likelihood of abuse to, or exposure to abuse of, the other children. On November 10, the circuit court entered an order finding that

4

probable cause still existed for the children to remain in DHS custody. It reserved its findings on reasonable efforts by DHS until the adjudication hearing but found that services and placements met the juveniles' needs. Cox and Bennett were awarded four hours of weekly supervised online visitation.

An adjudication hearing was held on December 16 and 21, 2020, and an order adjudicating the children dependent-neglected based on chronic neglect, inadequate supervision, sexual abuse, educational neglect, medical neglect, and parental unfitness was entered on December 22. Evidence presented at that hearing included testimony that on October 23, 2020, after undergoing hair-follicle testing, MC4 tested positive for methamphetamine and THC; MC3 tested positive for methamphetamine, cocaine, and THC; and MC2 tested positive for methamphetamine and cocaine. Dr. Rachel Clingenpeel diagnosed the children as neglected; there were longstanding concerns regarding their health and safety.

Bennett, who was living with his sister, testified that he was looking for adequate housing; that MC1 had been receiving counseling; and that he was receiving only about one hour of weekly visitation instead of the four hours he had been granted. Cox stated that she was willing to work the services offered to be reunited with her children. Cox also wanted more visitation, even though she had exercised visitation only twice, and she had never exercised visitation with MC1.

The circuit court found that DHS had not made reasonable efforts to prevent removal because its safety plan included the maternal grandmother, whose boyfriend was an alleged

5

sexual perpetrator; Bennett was not referred for any services and had only two drug screens; and Cox had two home visits and was offered drug screens, but no other services. The circuit court found it unconscionable that DHS had not offered mental-health services to the family based on their needs and history. However, the circuit court found that the services and placements met the children's health, safety, and educational needs. The court ordered that Cox and Bennett receive at least four hours of supervised visitation per week.

A review hearing was held on August 18, 2021. The circuit court ordered that the children remain in DHS custody and found that their placements—MC1 in a qualified residential treatment program (QRTP); MC2 in a therapeutic foster home; MC3 in residential treatment; and MC4 in a foster home—were meeting the children's special needs and best interest. The goal of the case remained reunification with Cox with a concurrent goal of guardianship or adoption with a fit and willing relative. The court noted that Cox had less than partially complied with the case plan and court orders because she was still testing positive for multiple illegal drugs; had not participated in mental-health treatment; and was not cooperative with DHS. The court found she had made minimal progress. Bennett was found to have substantially complied with the case plan and court orders, having participated in some visitations and completed his drug-and-alcohol assessment; however, he had not followed the assessment recommendations, and he had not participated in any mental-health treatment. The court found that DHS had made reasonable efforts to place the children together, but the court found it was in the best interest of the juveniles to be separated, given that each juvenile had special needs, and there was not a foster home

6

available to take the sibling group and meet each of their needs. However, the court found DHS had not made reasonable efforts to ensure that the children had regular, consistent visitation or other ongoing contact with each other, and DHS had not made reasonable efforts to provide family services or keep the parents apprised of a change in caseworkers, and it had not used due diligence to identify and provide notice to all adult relatives of the children.

A permanency-planning hearing was held on October 13 and 28, 2021, and an order was filed on April 25, 2022. The goal of the case remained reunification with a fit parent with a concurrent goal of guardianship with a fit and willing relative. The court found that the case plan, services, and placement in foster homes met the children's special needs and best interest—MC1 had been placed in a QRTP but was now in an acute/subacute stay; MC2 was in a therapeutic foster home; MC3 was currently in residential treatment; and MC4 was doing well in her foster home. Cox was found to have partially complied with the case plan, and Bennett was found to have more than partially—but less than substantially—complied with the case plan; both Cox and Bennett were failing to submit to drug screens. The circuit court found that DHS had not made reasonable efforts to ensure regular and consistent visitation between the children; and although DHS had not made reasonable efforts to provide family services since the last hearing, DHS had now remedied the issues that led to that finding by setting up necessary referrals, appointments, and visitation links, although MC3's placement did not permit online visitation, and MC1 chose not to participate in visitation. The court ordered Cox and Bennett to participate in drug rehabilitation,

complete their psychological evaluations, participate in counseling, and submit to drug screens.

A permanency-planning hearing was held on July 15, and an order was entered on August 10. The goal of the case remained reunification with a fit parent with a concurrent goal of guardianship with a fit and willing relative. The court found that the case plan, services, and placement in foster homes met the children's special needs and best interest— MC1 was in a provisional foster home with her maternal grandmother; MC2 was in a residential treatment facility; MC3 was placed in a QRTP; and MC4 was in a foster home. The court expressed concern about MC1's placement with her maternal grandmother since the grandmother's boyfriend was an offender on some of the children; DHS was ordered to ensure the placement was appropriate. Both Cox and Bennett were found to have more than minimally—but less than partially—complied with the case plan; both admitted to using illegal drugs and continued to test positive for illegal substances. The court found DHS had not made reasonable efforts to ensure that the children had regular, consistent contact with each other or to provide family services; although the court appreciated the new case worker's efforts to coordinate visitation and perform drug screens, it did not make up for the problems that had plagued the case. The circuit court made a finding of aggravated circumstances in the permanency-planning order, concluding that there was little likelihood that continuing to offer services to the family would result in a successful reunification because Cox and Bennett had not benefited from the services available to them.

Another review hearing was held on October 19, 2022, and an order was entered on December 30; the circuit court found it was in the children's best interest to remain in DHS custody. Specifically, the court found that the children could not be placed with Cox, either permanently or on a trial basis, because there had been no progress in individual or family therapy; Cox still blamed MC1 for the children being in foster care; she still had not resolved her substance-abuse issues; and she had no stable housing. The children could not be placed with Bennett because he was still not participating in therapy, and he was still using illegal substances. However, the goal remained reunification with a concurrent goal of guardianship or adoption with a fit and willing relative. The court determined that it was not in the children's best interest to remain separated, and they were not receiving services to address the sibling-relationship issues. The court found that Cox and Bennett had minimally complied with the case plan, and neither had made progress toward remedying the reasons for the children's removal because both were still using illegal drugs and needed drug treatment. The court found that DHS had not made reasonable efforts to ensure that the children had regular and consistent visitation with each other, and although there had been testimony that some of the siblings did not get along, there had been no sibling therapy. The court again found that DHS had not made reasonable efforts to provide family services.

A review hearing was held on March 13, 2023, and the resulting order was filed on June 30. It ordered that the children remain in DHS custody, although the goal remained reunification with a concurrent goal of guardianship with a fit and willing relative. The court found that Cox had made no progress in either individual or family therapy; she still had

9

substance-abuse issues; and she had no stable housing. Bennett continued to use and test positive for illegal substances, he was not addressing his substance-abuse issues, and he was not participating in therapy. The court found that the case plan, services, and placements met the children's special needs and best interest. The court reserved a reasonable-efforts finding by DHS given that the current caseworker was new to the case, although it found DHS had used reasonable efforts to maintain ongoing sibling contact. The court found that Cox and Bennett had minimally complied with the case plan—while participating in visitation and counseling, both were still using illegal substances and had demonstrated no progress toward alleviating the reasons for the children's removal.

A permanency-planning hearing was held on July 10, 2023; the order, which was not filed until August 25, changed the permanency goal to adoption with a fit and willing relative with a concurrent goal to place custody with a fit parent. The court found that while the placements of the children met their special needs, it was not in their best interest to be separated—both MC1 and MC3 had been in eighteen placements, MC2 had fifteen placements, and MC4 had eight placements. The court found Cox and Bennett had minimally complied with the case plan—there was a lack of progress, especially in the area of substance abuse—and DHS had made reasonable efforts toward reunification, offering foster-home placements, supervised parental visitation and sibling visitation, individual and family therapy, parenting classes, transportation, medical services, drug-and-alcohol screenings and testing, placement referrals, and clothing and shoe vouchers.

10

DHS and the attorney ad litem filed a petition to terminate Cox's and Bennett's parental rights on August 23, 2023. The grounds asserted for termination were (1) the children had been adjudicated dependent-neglected and had continued out of custody of the parent (Cox) and noncustodial parent (Bennett) for a period of twelve months, and despite a meaningful effort by DHS to correct the conditions causing removal, the conditions had not been remedied, *see* Ark. Code Ann. § 9-27-341 (b)(3)(B)(i)*(a)*, *(b)* (Supp. 2023); (2) subsequent factors, *see id.* § 9-27-341 (b)(3)(B)(vii)*(a)*; and (3) aggravated circumstances—little likelihood of successful reunification, *see id.* § 9-27-341 (b)(3)(B)(ix) *(a)(3)(A)*. DHS also alleged that it was in the children's best interest for Cox's and Bennett's parental rights to be terminated.

At the termination hearing, Cox testified that she and Bennett were currently living with her mother, and her only income was from Social Security. She said that her children were taken into custody due to sexual-assault charges; she agreed that there were also issues of substance abuse and exposure to illegal drugs, but she denied that she was the source of that problem. Cox admitted that she had used marijuana two days before the termination hearing and cocaine a month or two before; she said that the drugs helped her anxiety, depression, and panic attacks because she had not seen a doctor to have her prescription medications refilled in a year and a half. Although she did not have a medical marijuana card, she asserted that smoking marijuana is not a crime, and she did not believe that she was addicted to marijuana or cocaine. She testified that she had participated in drug counseling but had not finished the program. She admitted that she could not take her

11

children home that day, but that DHS had been helping her look for appropriate housing; she believed that was the only barrier to having her children returned to her. She believed that the only service her children needed was counseling; she had participated in two family-counseling sessions with MC1 and none with her other children. Cox admitted she had not had many visits with her children.

Bennett testified that he and Cox were living with Cox's mother because she had health issues and could not live by herself. He admitted he had used marijuana with his children in the house, and while Cox had previously used illegal substances, he claimed she did not do that any longer, and she had never used them in front of the children. He admitted using marijuana two days before the termination hearing, even though he did not have a medical marijuana card, and using cocaine a month or two before the termination hearing, but he denied being addicted to it, and he did not believe he needed drug treatment. He said that he was not aware that MC1 was being sexually assaulted until it was reported, and he denied that he was responsible for the sexual assaults, stating that he could not be responsible for something that happened when MC1 ran away. Bennett testified that he had completed parenting classes, and he had attended four drug-treatment classes, but he had stopped after his and Cox's son was killed and had not resumed the classes. Bennett had participated in two family-therapy sessions with MC1. He believed that he was in a position to take his children home from the termination hearing, even though he did not have a home of his own. Bennett was currently working three days a week at the Super 8 Motel, and he also did lawn service for his pastor.

12

Amber Smith, the program coordinator at Haven House and MC1's therapist, testified that MC1 preferred to use male pronouns and was working on trauma processing in therapy, but there had been little to no progress because MC1 had been consistently in crisis since arriving at Haven House. Smith testified that she had asked for discretion in determining whether Cox and Bennett had visitation with MC1 because there was a direct correlation between visitation and MC1's dysregulation; there was a connection between visitation and MC1's hospitalizations.

Dorthea Sanchez, the CASA worker appointed to the case, testified that her recommendation was for parental rights to be terminated so that the children could move forward. She said that at this point, the children were "stagnant"; they were all receiving therapy, but she was unsure that they were benefiting from it. She said that MC1, MC2, and MC3 had issues after visitation; they wanted visitation, but after they went, they would spiral down. Sanchez was concerned that if the children were returned to their parents, they would be going back into the same situation from which they were removed. Sanchez admitted that she had had no contact with Cox or Bennett during the case.

Christopher Rudy, a DHS adoption specialist, testified that he had run a data match for all four children using various mental, developmental, and behavioral characteristics. He noted that some of the children may require counseling, and he also noted histories of self-harm; runaway tendencies; educational needs for the children; and the age, gender, and race of each child. For MC1, there were fifty-nine matches; for MC2, there were seventy-four matches; for MC3, there were seventy-eight matches; and for MC4, there were one hundred

fifty-eight matches. There were no matches for the sibling group as a whole, but Rudy testified that was subject to change.

Kayla Perry, the DHS caseworker since May 2023, testified that the children were initially removed due to MC1's sexual abuse; additionally, there were allegations of drug abuse, neglect, inadequate supervision, and educational neglect. Perry opined that Cox and Bennett had made no progress toward remedying the conditions that had caused removal, and she recommended termination of parental rights as to all four children due to the continued use of illegal substances by Cox and Bennett.

After the termination hearing, the circuit court denied the termination of parental rights as to MC1. While finding there was little likelihood that continuing to offer services to Cox and Bennett would result in MC1 being placed with them, it found that it was not in MC1's best interest for parental rights to be terminated. In making this decision, the circuit court stated that it had considered the likelihood of adoption, her age, and the specific trauma she had dealt with, including the number of acute placements during the pendency of the case. However, as to MC2, MC3, and MC4, the circuit court granted the petition to terminate parental right on all bases pled in the petition. The circuit court noted that it had made no reasonable-efforts findings throughout the case because early in the case, DHS had an issue with providing appropriate services to Cox and Bennett, but as of the July 10, 2023 permanency-planning hearing, looking at the case as a whole, the court did find that DHS had made reasonable efforts. The court found Cox and Bennett were in no greater a position at the termination hearing than when the case began; there was an opportunity to achieve

14

permanency; and the most appropriate goal was to terminate parental rights and move forward with adoption with a fit and willing relative.

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the children. *Williams v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 162. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juveniles will be adopted and of the potential harm caused by returning custody to the parent. *Id.* Each of these requires proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. *Id.*

Termination of parental rights is an extreme remedy and derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the children. *Collier v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 100, 641 S.W.3d 67. We review termination-of-parental-rights cases de novo, but we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Isom v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 159. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, due deference is given to the circuit court's opportunity to judge the credibility of witnesses. *Gascot v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 57.

15

Neither Cox nor Bennett challenges the grounds relied on by the circuit court for termination; therefore, we need not review whether the circuit court erred in finding that statutory grounds for termination existed. *See Robinson v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 251, 520 S.W.3d 702. The only argument on appeal is that termination of their parental rights was not in their children's best interest. We disagree.

A best-interest finding must be based on consideration of at least two factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by continuing contact with the parent. *Baxter v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 508. It is the overall evidence—not proof of each factor—that must demonstrate termination is in the children's best interest. *Id.*

Cox argues that the evidence failed to prove that termination of her parental rights was in the children's overall best interest. She contends that the circuit court is required to consider adoptability in making a best-interest determination, although she acknowledges that abundant evidence of adoptability is not required. She argues that DHS failed to offer sufficient evidence that permanency for MC2, MC3, and MC4 could be achieved through adoption; in support of that assertion, she points to the numerous placements of each child during the pendency of the case. She contends that the testimony from adoption specialist Rudy should be disregarded because he had received the case only a month before the termination hearing and had never met the children. While Cox acknowledges that this was not a situation in which the testimony as to adoptability was that "all children are adoptable," *see Grant v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 636, 378 S.W.2d 227, she asserts that

16

it is "utterly illogical" to conclude that adoption was likely for children who had as many placements as her children during their stay in DHS custody, including numerous stays in mental-health facilities, and that if their history and inability to maintain placements is not a barrier to adoption, it was "unclear that DHS will ever acknowledge a barrier can ever exist for any child." Cox also contends that the circuit court failed to consider the impact termination would have on family relationships, especially between the siblings, noting that the circuit court had consistently found that DHS had not made reasonable efforts to place the children together or to ensure that they had consistent visitation with each other.

Bennett also challenges the circuit court's best-interest finding in terminating his parental rights, attacking DHS's failure to provide services for him, to facilitate that the children be placed together or to maintain the sibling bond, and to ensure the children's stability. He argues that hearings were not timely held, even though he admits that continuances were agreed upon by counsel. He noted that MC3 and MC4 wanted their family back together, but he admitted that conflict between MC1 and MC2 prevented placement of the children together; nevertheless, he argued that the children had not requested that parental rights be terminated. Bennett also challenges the testimony of adoption specialist Rudy as to adoptability, arguing that there were no matches for the sibling group as a whole, the adoption specialist did not know the effect of adopting the children individually, he had not met with the children before making his recommendation, and he did not know the effect that separation would have on the children. He also argues, like Cox, that that it was "utterly illogical" to say there were "no barriers" to adoption in this

17

case; given the multiple placements in the case, it was unclear that DHS would ever determine that a barrier could ever exist. Bennett admitted that he had failed his children with his continued drug use, but he argued that his children had no more stability, safety, or consistency in DHS custody than in his custody, and if they were in his custody, they were with their parents, they had each other, and they felt loved and safe.

We hold that the circuit court's termination of parental rights was in the children's best interest. Clearly, there was potential harm in returning the children to the custody of Cox and Bennett. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Parks v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 488, ___ S.W.3d ___. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Id.* The circuit court found one ground for termination was that the issues causing removal had not been remedied; both Cox and Bennett were still testing positive for illegal substances at the time of the termination hearing. A parent's drug use and failure to comply with court orders supports a potential-harm finding. *Id.* A parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the children be returned to the parents' care and custody. *Id.* To the extent Cox and Bennett contend that DHS failed to prove potential harm because DHS did not offer appropriate services during the case, we have repeatedly rejected this argument because a best-interest finding does not require evidence of reasonable efforts. *Id.*

As for adoptability, the circuit court is required only to consider adoptability in determining the overall finding of best interest in termination cases. *Baker v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 549, 680 S.W.3d 450. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Strickland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 608, 567 S.W.3d 870.

In this case, the circuit court clearly considered adoptability; it was one of the factors stated for denying termination of parental rights as to MC1, yet it granted the petition as to the other three children. There was evidence of numerous matches for each child, even given their unique and challenging histories. Additionally, the Juvenile Code does not require certainty, let alone a guarantee, that siblings be adopted as a group. *Wilkerson v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 88, 684 S.W.3d 319. Here, as in *Fisher v. Arkansas Department of Human Services*, 2017 Ark. App. 693, 542 S.W.3d 168, the circuit court heard evidence concerning adoptability of the children, the fact that they would likely not be adopted together, the children's behavioral and mental-health challenges, and Cox's and Bennett's substance-abuse issues and instability, and it weighted the evidence in favor of termination. The evidence does not bear out Cox's and Bennett's claims that if this case does not prevent "barriers" to adoption, then no case can be said to have any barriers to adoption. There was evidence of numerous potential matches for each child, even given their mental-health and behavioral issues. Bennett's argument that the children had not requested termination of parental rights is of no consequence since such a request is not a requirement for termination of parental rights. As to the arguments regarding DHS's

19

shortcomings during the pendency of this case, while DHS admits that it failed to provide services in a timely manner, this has no bearing on whether the children are adoptable. The circuit court's finding that it was in the children's best interest to terminate parental rights was not clearly erroneous.

Affirmed.

GRUBER and MURPHY, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Tamela Cox.

*Dusti Standridge*, for separate appellant Adrian Bennett.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.